RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0153p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

CAMILLE HADDAD,

        *Plaintiff-Appellant,*

    *v.*

ALEXANDER, ZELMANSKI, DANNER & FIORITTO, PLLC,

        *Defendant-Appellee.*

No. 13-2026

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit
No. 2:10-cv-11996—Bernard A. Friedman, District Judge.

Decided and Filed: July 16, 2014

Before: SUHRHEINRICH, MOORE, and WHITE, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:** Daniel P. Feinberg, THE MEISNER LAW GROUP, P.C., Bingham Farms, Michigan, for Appellant. Mark B. Davis, ZELMANKSKI, DANNER & FIORITTO PLLC, Plymouth, Michigan, for Appellee.

───────────────

**OPINION**

───────────────

PER CURIAM. Plaintiff Camille Haddad ("Haddad") appeals the order of the district court granting summary judgment to Defendant law firm Alexander, Zelmanski, Danner & Fioretti, PLLC, ("Firm") in this action brought under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, and the Michigan Collection Practices Act ("MCPA"), Mich. Comp. Laws § 445.251, *et seq.* We reverse.

1

## I. Background

Haddad bought a unit in Cumberland Condominiums on May 15, 1991. He lived in the condominium until 2005, and then began renting it out. The Firm represents Cumberland Condominium Association (the "Association"). Kramer-Triad Management Group LLC ("Kramer-Triad") was the Association's property manager. In October 2008, the Firm, on behalf of the Association, sent Haddad a notice of delinquency in his condominium assessments. The letter stated that Haddad owed the association $898, which was composed of $803 in unpaid assessments, $40 in late charges, and $55 in legal fees and costs. ID# 239. The letter informed Haddad that if the amount demanded was not paid within thirty days, the association would begin proceedings to file a lien against the condominium. Lastly, the letter indicated that the Firm was "attempting to collect a debt from you." ID# 240.

On November 13, 2008, Haddad notified the Firm that he disputed the amount demanded. He also stated that he had lived in the condominium for over 15 years and had never missed a monthly dues payment, but that "[r]ecently," he had been "singled out and charged with various violations of the By Laws by K/T [Kramer/Triad] supposedly representing the Board, non [sic] of which applied to the violation, or had any relevance to it." ID# 241.

On December 3, 2008, the Firm responded. It sent Haddad a second notice, indicating that full payment of the outstanding debt should be sent within ten days, or the association would file a lien against the property pursuant to Mich. Comp. Laws § 559.208(3). The Firm provided Haddad with a recent copy of his account ledger, beginning January 11, 2008, which had been prepared by Kramer-Triad. The letter stated in pertinent part:

> As you can see from reviewing your account ledger, the balance owed stems from several late charges that were assessed to your account throughout the course of this year. Also, there is $55.00 in legal fees due for the October 29, 2008 letter that our office sent to you. You should be aware that, under the Bylaws, the Association imposes a late charge on all delinquent accounts each month for **as long as any balance remains owing** on the account, regardless of whether or not the monthly assessment payment on the delinquent account was in fact late in each new month.
>
> The total remaining amount owed on your account at this time is $938.00. This amount is comprised on the remaining balance as stated on the enclosed

account ledger, plus the December monthly assessment of $313.00 and $55.00 in legal fees and costs.

ID# 297.

Haddad sent another letter to the Firm on December 9, 2008, stating that the December 3 letter failed to explain the beginning balance of $75. He noted that he had spoken with Diane McEvoy, who said the $75 consisted of $25 for "having a hot water heater in my patio," but that "[s]he had no information or proof of the $50.00 balance, nor any details of the subsequent fines that were assessed." ID# 301. Haddad indicated that he was withholding payment until the Firm provided him with "the date, bylaw citation and detailed description of every charge, as well as a copy of the relevant bylaw." *Id.*

On January 20, 2009, the Firm responded by letter and included another ledger. This ledger began approximately as of August 1, 2006, which showed an initial account balance of $50. The January 20 letter demanded $1,063 in charges, which consisted of $363 in condominium assessments, $200 in fines, $400 in late charges, and $100 in legal fees. The letter stated that the "$363.00 in unpaid assessments on your account is comprised of $313.00 for January 2009 and the $50.00 remaining balance that existed on your account when Kramer-Triad took over management of the Association in August 2006." This letter also pointed out that "there were several months' worth of late charges imposed on your account as a result of the continuing [$50.00] unpaid balance." ID# 246. The letter provided several pages of the relevant sections of the condominium bylaws:

> Per your request, I have also enclosed copies of several pages containing the relevant sections of the Condominium Bylaws that authorize the Association to collect these amounts from you. Specifically, I have enclosed Article II (regarding the Association's authority to impose and collect assessments), Article VI, Sec. 1-2 (regarding leasing of units by co-owners) and Sec. 14 (regarding the Association's power to impose all costs of enforcing the Bylaws, including legal fees and costs, on the defaulting co-owner), and Article XVII, Sec. 1 (regarding the Association's power to impose fines and take legal action against co-owners for Bylaw violations).

ID# 302.

On February 23, 2009, Haddad sent another letter, stating that "[t]he $50.00 balance from the previous management company is unsubstantiated and I believe not valid unless you can show me why and when it was assessed."  ID# 307.  Haddad acknowledged the $25 hot water violation.  Haddad indicated that he was willing to pay the $25 fine for the hot water heater and the $50 "hold over" from the prior management "if it can be substantiated."  ID# 308.

On May 18, 2009, the Firm sent Haddad a letter itemizing outstanding charges of $1,704, which consisted of $1,416 in outstanding assessments, $80 in late fees, and $208 in legal fees.  Defendant enclosed a copy of a Notice of Lien it planned to file on behalf of Cumberland Condominium Association.  The $1,416 figure represented the outstanding assessments as determined by the by-laws of the condominium agreement and the Michigan Condominium Act, (MCA), Mich. Comp. Laws § 559.208(3)(iii).  The Notice of Lien stated that the $1,416 was "exclusive of any costs, late charges, interest, fines, attorney fees and future assessments."  The Firm filed the lien, which was recorded with the Oakland County Register of Deeds on May 19, 2009.

On February 19, 2010, the condominium association informed the Firm that "the Association was going to release the lien on this unit," and directed to the Firm "to do that."  ID 309.  The Firm processed the lien discharge that same day.  The discharge was recorded with the Oakland County Register of Deeds on February 22, 2010.

Haddad sued, pursuant to the FDCPA and MCPA, alleging that the Firm had violated 15 U.S.C. §§ 1692e, which prohibits the use of any false, deceptive or misleading representation in the collection of any debt, and § 1692g(b), which prohibits continuing the collection of any disputed debt until the debtor collector obtains verification of the debt.  The parties filed cross-motions for summary judgment.  In May 2011, the district court granted summary judgment to the Firm on the ground that the debt at issue was commercial because Haddad was renting his property when the Firm began its collection efforts and thus the underlying debt could not be considered "primarily for personal, family, or household purposes" as defined by the FDCPA.  This court reversed, holding that an obligation to pay assessments arose from the original

purchase, not when the collection efforts began, and thus constituted a "debt" under the FDCPA. *See Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 698 F.3d 290 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 1726 (2013).

On remand, the parties filed new cross-motions for motions for summary judgment. The "central issues" before the court were "whether Defendant properly 'verified' the debt and whether Defendant's actions in collecting the debt were misleading, in violation of the FDCPA and MCPA." ID# 386. On June 5, 2013, the district court granted summary judgment to the Firm finding that the Firm had "properly verified the debt as requested by [Haddad] and as required by the FDCPA." ID# 388. The court further concluded that its collection efforts were not deceptive or misleading, in violation of the FDCPA or MCPA. This appeal follows.

## II. Standard of Review

We review the district court's grant of summary judgment de novo. *Bowling Green v. Martin Land Dev. Co.*, 561 F.3d 556, 558 (6th Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III. Analysis

### A. Law of the Case

In the previous appeal, we stated that "the Firm did not verify the debts and recorded a Notice of Lien in May 2009." *Haddad*, 698 F.3d at 292. Haddad claims that the district court erred in characterizing this statement as dicta and granting summary judgment to the Firm on this issue.

The law of the case prevents the relitigation of an issue once it has been decided. *Bowles v. Russell*, 432 F.3d 668, 676 (6th Cir. 2005), *aff'd*, 551 U.S. 205 (2007). But the doctrine

applies only if the appellate court "either expressly or by necessary implication decides an issue." *Id.* (internal quotation marks and citation omitted). If the statement is not necessary to the outcome, it is dicta and nonbinding. *United States v. McMurray*, 653 F.3d 367, 375-76 (6th Cir. 2011).

The district court correctly concluded that the foregoing statement was not necessary to the outcome of the earlier appeal and therefore not binding. The sole issue in our earlier appeal, as articulated at the outset of the opinion, was "whether an assessment owed to a condominium association qualifies as a 'debt' under the . . . [FDCPA], . . . where the condominium owner bought the property for his personal use, resided there for fifteen years, and now leases the condominium." *Haddad*, 698 F.3d at 291.

Haddad argues that this court addressed this question only after it had concluded that the Firm had failed to verify the debt, and that "if this court had not already concluded that [the Firm's] conduct was violative [sic] of the FDCPA, the question of whether or not the debt was a consumer debt would have been moot." Appellant's Br. at 17. The opposite is true. If there was no "debt" as defined by the FDCPA, then the Firm's conduct, no matter how egregious, could not have violated the FDCPA. The prior panel made no findings of fact regarding verification of the debt or lack thereof. Thus, the district court properly took up the issue on remand. *See Kavorkian v. CSX Transp., Inc.*, 117 F.3d 953, 958-59 (6th Cir. 1997) ("The trial court is free to consider any issues not decided 'expressly or impliedly by the appellate court.'" (citation omitted)).

This brings us to Haddad's second contention.

### B.  Failure to Verify the Debt

Haddad argues that the Firm did not adequately verify the debt as required in 15 U.S.C. § 1692g(b). As there are no material factual disputes about the course of events, he asks this court to reverse the grant of summary judgment for the Firm and instead grant summary judgment in his favor, a motion denied by the district court.

Under 15 U.S.C. § 1692g(b), "[i]f the consumer notifies the debt collector in writing" within thirty days of receiving "communication . . . in connection with the collection of any

debt," that he disputes any portion of the debt, "the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt . . ." 15 U.S.C. § 1692g.  The statute, however, does not specify what the process of "verification" requires. "When a term is undefined, we give it its ordinary meaning." *United States v. Santos*, 553 U.S. 507, 511 (2008)). "'As in all cases of statutory construction, our task is to interpret the words of [the statute] in light of the purposes Congress sought to serve.'" *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 118 (1983) (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 608 (1979)).

> The legislative history provides limited guidance, stating simply that:

> Another significant feature of this legislation is its provision requiring the validation of debts.  After initially contacting a consumer, a debt collector must sent [sic] him or her written notice stating the name of the creditor and the amount owed. If the consumer disputes the validity of the debt within 30 days, the debt collector must cease collection until he sends the consumer verification.

> This provision will eliminate the recurring problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid. Since the current practice of most debt collectors is to send similar information to consumers, this provision will not result in additional expense or paperwork.

S. Rep. No. 95-382, at 4 (1977), *reprinted in* 1977 U.S.S.C.A.N. 1695, 1699.

While there are several dictionary definitions of verification, they too provide only limited insight. *See Summit Petroleum Corp. v. U.S. EPA*, 690 F.3d 733, 741-42 (6th Cir. 2012) ("This Court, and others as well, have often consulted dictionaries to ascertain the meaning of words.").  For example, two definitions of verification, "evidence that establishes or confirms the accuracy or truth of something" and "the process of research, examination, etc., required to prove or establish authenticity or validity," *Random House Unabridged Dictionary* 2113 (2d ed. 1993), strongly suggest that to verify a debt, the debt collector must seek out and provide evidence that the actual debt amount is what is owed.  On the other hand, two other definitions, "a formal assertion of the truth of something, as by oath or affidavit" and "a short confirmatory affidavit at the end of a pleading or petition," *id.*, suggest that verification is simply a matter of formalism—providing an official statement of what is being asserted.  Thus, a dictionary provides only

limited direction in determining the extent of what verification under 15 U.S.C. § 1692g(b) requires.

Our circuit has not dealt with the issue of what verification under 15 U.S.C. § 1692g(b) requires. The leading opinion—and one of very few in the courts of appeal—appears to be the Fourth Circuit's *Chaudhry v. Gallerizzo*, 174 F.3d 394 (4th Cir. 1999). The Fourth Circuit stated:

> [V]erification of a debt involves nothing more than the debt collector confirming in writing that the amount being demanded is what the creditor is claiming is owed; the debt collector is not required to keep detailed files of the alleged debt. *See Azar v. Hayter*, 874 F. Supp. 1314, 1317 (N.D. Fla.), *aff'd*, 66 F.3d 342 (11th Cir. 1995), *cert. denied*, 516 U.S. 1048 (1996). Consistent with the legislative history, verification is only intended to "eliminate the . . . problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid." S. Rep. No. 95–382, at 4 (1977), *reprinted* in 1977 U.S.C.C.A.N. 1695, 1699. There is no concomitant obligation to forward copies of bills or other detailed evidence of the debt.

*Id.* at 406.[1] However, in *Chaudhry*, the debt collector there actually provided far more to the debtor as part of the verification than this bare minimum that the Fourth Circuit panel said was required. As the panel recited:

> In the present case, [the debt collector], after receiving assurances from [the creditor] that the sums were owed, verified the debt amounts in his January 18th letter to Plaintiffs' counsel and forwarded a copy of the [creditor]'s computerized summary of the Chaudhrys' loan transactions. The summary included a running account of the debt amount, a description of every transaction, and the date on which the transaction occurred. *See Graziano v. Harrison*, 950 F.2d 107, 113 (3d Cir. 1991) (holding that computer printouts which confirmed amounts of debts, the services provided, and the dates on which the debts were incurred constituted sufficient verification).

*Chaudhry*, 174 F.3d at 406. Thus, the court held that the verification requirements under 15 U.S.C. § 1692g(b) were met where the debt collector "forwarded a copy of the [creditor]'s

---

[1]In *Smith v. Transworld Sys., Inc.*, 953 F.2d 1025 (6th Cir. 1992), we stated that no "independent investigation" is required under the FDCPA. *Id.* at 1032. This statement, however, referred to determining whether the amount demanded by the collector was accurate in order to avoid liability under 15 U.S.C. § 1692e(2)(A) by falsely representing the amount of the debt. With regard to verification under 15 U.S.C. § 1692g(b), the *Smith* court simply restated the statutory purpose as articulated by the district court in that case: "requir[ing] debt collecting agencies to cease collection activities if the amount has been disputed until the debt collector verifies the accuracy of the amount claimed." *Id.* at 1031.

computerized summary of the Chaudhrys' loan transactions. . . . includ[ing] a running account of the debt amount, a description of every transaction, and the date on which the transaction occurred." *Id.*

In *Mahon v. Credit Bureau of Placer County Inc.*, 171 F.3d 1197 (9th Cir. 1999), a Ninth Circuit panel acknowledged in dicta that a creditor had "properly verified the debt" where, in response to a debtor's request for verification, the debt collector contacted the creditor, "verified the nature and balance of the outstanding bill, learned that monthly statements had been sent . . . to the [debtor] for over two years, and established that the balance was still unpaid. The [debt collector] then promptly conveyed this information to the [debtor], along with an itemized statement of the account." *Id.* at 1203. In a subsequent Ninth Circuit case, a different panel was asked "to hold that *Mahon* sets a standard below which a debt collector's verification efforts must not fall." *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1173 (9th Cir. 2006). The *Clark* court characterized the *Mahon* dicta as "one way to provide verification," but "decline[d] to impose such a high threshold." *Id.* Instead, it explicitly "adopt[ed] as a baseline the more reasonable standard articulated by the Fourth Circuit in *Chaudhry.*" *Id.* Yet, even in *Clark*, the debt collector did far more than verify in writing that the amount the debt collector is seeking is the amount the creditor claims is owed. Instead, the debt collector, when asked for verification, "obtained information from [the creditor] about the nature and balance of the outstanding bill and provided the [debtor] with documentary evidence in the form of the itemized statement." *Id.* at 1174.

The Third Circuit similarly approved of the practice of providing an itemized accounting as verification of the debt. In *Graziano v. Harrison*, 950 F.2d 107 (3d Cir. 1991), the debt collector sent a notice stating the name of the creditor and the amount of the unpaid debt ($80). *Id.* at 109. The debtor requested verification of the debt. The verification listed a different date and described the services provided as "E.R. Extended Service." *Id.* Enclosed with the verification was a bill and computer printout for an additional debt of $35 for services provided on another date. *Id.* A Third Circuit panel held that the debt collector satisfied the verification requirement, because "[t]he computer printouts provided to [debtor] were sufficient to inform

him of the amounts of his debts, the services provided, and the dates on which the debts were incurred." *Id.* at 113.

A decision from the Eighth Circuit confirms that the verification requirement is satisfied where the debtor "could sufficiently dispute the payment obligation." *Dunham v. Portfolio Recovery Assocs., LLC*, 663 F.3d 997, 1004 (8th Cir. 2011). There, the debt collector, a debt collection agency that purchased debt portfolios, responded to a verification request with a letter containing "the debtor's name, address, and the last four digits of the debtor's social security number; the date of the payment obligation; the date [the debt collector] purchased the payment obligation [from the original creditor]; and the current outstanding balance on the payment obligation." *Id.* at 999. However, the debt collector did not contact the original creditor and did not send "the original amount of the debt, the date upon which the debt was incurred, or the goods or services for which it was incurred." *Id.* at 1000 (internal quotation marks omitted). However, upon receipt of the verification letter, the debtor "immediately recognized that the last four digits of the debtor's social security number did not match his own," *id.*, and thus "[a]t that point" did not fear that he owed any debt. *Id.* The debtor argued on appeal that "verification" meant that the debt collector "must acquire additional information about the debtor from the original creditor and send that additional information to [the debtor]." *Id.* at 1003. The Eighth Circuit held that the verification was sufficient because, "[c]onsistent with the legislative history," the debt collector "sent [the debtor] enough information to put him on notice that it dunned the wrong person." *Id.* at 1003. Significantly, the court noted that "[u]nder different facts, perhaps a debt collector must do more than what [the debt collector] did here." *Id.* at 1003. The Eighth Circuit remarked that its conclusion was supported by "[s]everal of our sister circuits," declining to set a high threshold, citing *Chaudhry*'s baseline standard and *Clark*'s adoption of that standard. *Id.*

These cases suggest that the "baseline" for verification is to enable the consumer to "sufficiently dispute the payment obligation." Although the answer to that question depends on the facts of a particular situation, the cases reflect that an itemized accounting detailing the transactions in an account that have led to the debt is often the best means of accomplishing that objective. Intuitively, such a practice makes good sense. In fact, it would likely lead to faster

resolutions of disputes with those consumers who act in good faith, because it will either show a valid debt that a consumer acting in good faith will actually pay, uncover an error in the record of the debt leading to the cancellation of the debt, or reveal the underlying dispute between the parties that can then be resolved. Finally, such an approach is consonant with the congressional purpose of the verification provision.

In the present case, the Firm actually attempted to send an itemized accounting. When presented with a collection attempt in October 2008, Haddad disputed the debt. The Firm responded by sending the first accounting ledger on December 3, 2008. After he received this accounting, Haddad disputed a *portion of the debt*—the carryover balance of $75.**2** The Firm sent a further accounting on January 20, 2009, but it once again included a carryover balance of $50 with no explanation as to the nature of the debt other than it was "the $50 remaining balance that existed on your account when Kramer-Triad took over management of the Association in August 2006." Haddad once again disputed this now-$50 carryover portion of the debt.

The Firm did not respond with any explanation such as a date or description of the nature of the charge. Instead, it filed a lien against Haddad's condominium; the lien encumbered Haddad's property rights for nine months. Because Haddad never received an accounting from the debt collector that showed why he was alleged to owe the original $50 charge, from which all subsequent late fees, fines, and attorney's fees flowed, he was unable to "sufficiently dispute the payment obligation." *Dunham*, 663 F.3d at 1004. Therefore, he was put to a choice. As he could not dispute the debt owed based on the information the Firm provided, he could either pay an amount he did not believe he owed or face the encumbrance of his property rights.

Such verification cannot be enough under the FDCPA, a statute intended to protect consumers. The verification provision must be interpreted to provide the consumer with notice of how and when the debt was originally incurred or other sufficient notice from which the consumer could sufficiently dispute the payment obligation. This information does not have to

---

**2**The statutory language provides that a consumer can dispute not only the whole debt, but also "any portion thereof." 15 U.S.C. § 1692g(b). This language suggests that a debt collector cannot simply assert an unqualified amount that a consumer owes a creditor. After all, the words "or any portion thereof" would be superfluous if a consumer, like Haddad, disputes a portion of the debt and asks for verification of that portion, and the creditor simply replies that he has verified that the entire amount (not the portion disputed) is the correct total amount owed according to the creditor.

be extensive. It should provide the date and nature of the transaction that led to the debt, such as a purchase on a particular date, a missed rental payment for a specific month, a fee for a particular service provided at a specified time, or a fine for a particular offense assessed on a certain date.

Such a notice requirement has the advantage of providing a clear standard that courts are accustomed to enforcing and can apply easily. Moreover, in today's world of computerized records management, it would not be a significant burden to debt collectors or creditors to provide such a record.[3] After all, that is precisely what the debt collector did in *Clark* in 2006, in *Mahon* and *Chaudhry*, both cases from 1999, and even in *Graziano*, a case from 1991.

Here too, the Firm attempted to do just that by sending two different statements of account. Haddad, however, disputed a portion of the debt—the carryover portion that was unexplained on these statements and which actually led to the rest of the charges. The Firm failed to verify this portion of the debt yet continued its efforts to collect this portion as well as the entirety by sending a letter demanding payment and placing a lien on Haddad's condominium. In doing so, the firm violated 15 U.S.C. § 1692g(b). On the question whether the Firm properly verified the debt, we reverse the grant of summary judgment for the Firm and grant summary judgment for Haddad.

## C. Misleading Statements

Lastly, Haddad alleges that the Firm misrepresented the character and amount of the lien, by including late charges and attorney fees in unpaid assessments because the Michigan Condominium Act, Mich. Comp. Laws § 559.208(3)(iii) ("MCA"), says that the Notice of Lien shall set forth the amounts due, "exclusive of interest, costs, attorney fees, and future assessments." Section § 1592e prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt."

This issue was adequately answered by the district court:

---

[3]As previously mentioned, we believe that providing the date and nature of the transaction that led to the debt will lead to faster resolutions of disputes. The practice of debt collectors providing such an accounting suggests that they likely expect such a benefit as well.

> However, Defendant indicated in the letter accompanying the lien notice that the outstanding debt was characterized in this way in order to comply with the MCA, which requires that the lien amount only include outstanding assessments but no fines or legal fees. *See* Mich. Comp. Laws § 559.208(3)(iii). The condominium by-laws provide that payments be applied first to late fees, fines, and legal fees and only thereafter to outstanding assessments. *See* Pl Br. Ex. I. Therefore, [the Firm's] lien filing in the amount of $1,416 arising from outstanding association fees reflects the by-laws of the association agreement and the MCA's requirements. This information was included in the communication to [Haddad] clarifying the reason for the change in formulation in contrast to the verification letters which showed the specific charges that gave rise to the outstanding balance.

ID# 394.

Haddad argues that application of the payments in the manner prescribed by the bylaws violates the MCA, but provides no authority for that assertion. This argument is without merit in any event. The FDCPA expressly authorizes such conduct. Section 1692f(1) prohibits debt collectors from using "unfair or unconscionable means to collect any debt," including "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) *unless such amount is expressly authorized by the agreement creating the debt or permitted by law." Id.* (emphasis added). *Cf. Rizzo v. Pierce & Assocs.*, 351 F.3d 791, 793-94 (7th Cir. 2004) (holding that collection of late fees under the mortgage and note did not violate the FDCPA because the terms of the note and mortgage explicitly required payment of all sums which would be due had no acceleration occurred).

Haddad also contends that "the vacillating amounts set forth in [the Firm's] various letters" were false and misleading. As the district court held, the Firm's December and January 2009 verification letters accurately delineated exactly which late fees, fines, attorney fees, and association fees went into the outstanding balance in accordance with the bylaws: first to fines and late fees and the remainder to association fees. As the court noted, the statements showed how the outstanding balances were calculated by showing the charges arising from each new entry and how subsequent payments were applied to the updated outstanding balance, and that "these entries track the balance and itemizations that [the Firm] communicated in its collection letters." ID# 393. Thus, as the district court indicated, "a careful reading" of the Firm's communications, "even by an unsophisticated consumer, would have led to the conclusion that

the amounts were accurate as reflected in the accompanying statements[.]" ID #393.**4** We AFFIRM the court's grant of summary judgment to the Firm on this issue.

## IV. Conclusion

For the foregoing reasons, the grant of summary judgment to the Firm is **REVERSED** and summary judgment to Haddad is **GRANTED**. The matter is **REMANDED** to the district court for further proceedings consistent with this opinion.

---

**4**Haddad does not present an argument regarding the application of the MCPA, so any claim under that statute is forfeited.