RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0054p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CARL WARD,

          *Plaintiff-Appellant*,

      *v*.

NPAS, INC.,

          *Defendant-Appellee*.

No. 21-6189

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:19-cv-00484—Aleta Arthur Trauger, District Judge.

Decided and Filed:  March 24, 2023

Before:  McKEAGUE, THAPAR, and LARSEN, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Geoffrey Parker, Jonathan L. Hilton, HILTON PARKER LLC, Reynoldsburg, Ohio, for Appellant.  Scott J. Dickenson, Megan D. Meadows, SPENCER FANE LLP, St. Louis, Missouri, for Appellee.

_____

## OPINION

_____

LARSEN, Circuit Judge.  Carl Ward sued NPAS, Inc. under the Fair Debt Collection Practices Act (FDCPA).  A previous panel of this court found that Ward did not have Article III standing to bring his claims.  On remand, Ward amended his complaint and added documents to the record to show he had suffered a concrete harm.  The district court concluded that those changes were sufficient to demonstrate Ward's standing but that Ward could not prevail on the

merits because NPAS, Inc. is not a debt collector in the meaning of the FDCPA. We agree with the district court on both counts and AFFIRM.

I.

Ward received medical treatment at Stonecrest Medical Center on two separate occasions: once in July 2018 and again in October 2018. Each time, he signed a Conditions of Admission agreement which stated that Ward was financially responsible for any charges not covered by insurance and that Stonecrest may "utilize the services of a third party Business Associate or affiliated entity as an extended business office ('EBO Servicer') for medical account billing and servicing." The agreement also stated that "[d]uring the time that the medical account is being serviced by the EBO Servicer, the account shall not be considered delinquent, past due or in default." In fact, the account could only be in default once the EBO servicer returned the account to Stonecrest; upon return, Stonecrest could then "determine the account to be delinquent, past due, and in default" and the account could be "subject to late fees, interest as stated, referral to a collection agency for collection as a delinquent account, credit bureau reporting and enforcement by legal proceedings." At his deposition, Ward confirmed that he received and signed the Conditions of Admission both times he was treated at Stonecrest.

After each treatment, Stonecrest sent Ward an initial bill for the $80 Ward owed, after insurance, for each visit.[1] These bills were due "upon receipt." After Ward did not pay the initial bills from Stonecrest, Stonecrest referred Ward's accounts to a third party for servicing on October 3, 2018 and December 22, 2018, respectively. That third party was NPAS, Inc. (Stonecrest's "Extended Business Office Servicer"). NPAS then contacted Ward for payment. In total, NPAS mailed Ward four statements and left him three voicemail messages. The statements included a due date, which was ten to fifteen days after the statement date, as well as a Frequently Asked Questions section that included an explanation of NPAS's role: "Q: Who is NPAS, Inc.? A: NPAS, Inc. is a company that is managing your account for the healthcare provider." In each voicemail it left for Ward, NPAS, Inc. identified itself only as "NPAS" (not "NPAS, Inc.").

---

[1]The bills Stonecrest sent Ward are not in the record, but Ward states—and NPAS does not dispute—that bills were sent on the first of the month and due upon receipt.

After receiving two voicemail messages, Ward contacted a law firm. The firm attempted to send NPAS a cease-and-desist letter on February 7, 2019. But the firm erroneously sent the letter to NPAS Solutions, a company unrelated to NPAS, Inc., so NPAS never got the letter. Ward received a third voicemail from NPAS on March 14, 2019.

Ward sued NPAS in June of 2019, alleging that NPAS had violated the FDCPA by not meaningfully disclosing its identity as a debt collector, *see* 15 U.S.C. § 1692d(6); by using a name other than its "true name" (NPAS instead of NPAS, Inc.) in the voicemails, *see* § 1692e(14); and by calling him after he attempted to send a cease-and-desist letter, *see* § 1692c(a)(2) & (c).[2] After the close of discovery, the district court granted NPAS's motion for summary judgment on the ground that NPAS did not qualify as a "debt collector" under the FDCPA. Ward appealed.

On appeal, NPAS questioned whether Ward had suffered an injury in fact sufficient to confer Article III standing. *See Ward v. NPAS, Inc. (Ward I)*, 9 F.4th 357, 359 (6th Cir. 2021). In response, Ward argued that he had been injured in three ways: because he was confused when NPAS identified itself in voicemails as "NPAS" rather than "NPAS, Inc."; because he had expenses associated with hiring counsel; and just because NPAS had violated the FDCPA. The panel rejected those grounds for standing. *Id.* at 361–63. But the panel reserved the question whether Ward's receipt of the third voicemail (after his attempt to send a cease-and-desist letter) could constitute an Article III injury, finding that Ward's complaint had not clearly alleged such a harm. *Id.* at 363.

On remand, the district court allowed Ward to amend his complaint. Ward's amended complaint added allegations related to the cease-and-desist letter and subsequent voicemail, including that "[t]he intrusion upon Plaintiff's phone services, time, and home life greatly irritated Plaintiff because he believed that he had successfully invoked his right to be free from intrusive voice messages months earlier, and the voicemail therefore came as a nasty shock and an unwanted intrusion upon seclusion." NPAS again moved for summary judgment. The district

---

[2]Ward initially sued an unrelated NPAS company; he corrected the complaint to name the proper entity in July 2019.

court denied NPAS's motion as to standing but again granted the motion as to substantive liability. Ward now appeals.

## II.

## A.

To establish standing, Ward must show (i) that he suffered an injury in fact; (ii) that was likely caused by the defendant; and (iii) that would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992)). An Article III injury, in turn, requires the "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560 (internal citations and quotation marks omitted). Ward, as the "party invoking federal jurisdiction[,] bears the burden of establishing" all three elements, *id.* at 561, though the parties agree that Ward's standing rises and falls with the first element, concrete injury.

As we held the first time this case was on appeal, "Ward does not automatically have standing simply because Congress authorizes a plaintiff to sue a debt collector for failing to comply with the FDCPA." *Ward I*, 9 F.4th at 361. "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). So Ward cannot "allege a bare procedural violation" of the FDCPA, "divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* Instead, "Ward must show either that the procedural harm itself is a concrete injury of the sort traditionally recognized or that the procedural violations caused an independent concrete injury." *Ward I*, 9 F.4th at 361. The "most obvious" kind of concrete harms are "traditional tangible harms, such as physical harms and monetary harms." *TransUnion*, 141 S. Ct. at 2204. But intangible harms can also be concrete. *Id.* The Supreme Court has counseled that "[c]hief among" these intangible concrete harms "are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," including "intrusion upon seclusion." *Id.* (citing *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.)). When such harms exist, Congress may "elevat[e]" them "to the status of legally cognizable injuries,"

even if those injuries "were previously inadequate in law." *Spokeo*, 578 U.S. at 341 (citation omitted).

Ward relies on intrusion upon seclusion to show his concrete harm. The common law tort by that name "generally requires a plaintiff to demonstrate that a defendant 'intentionally intrude[d], physically or otherwise, upon the solitude or seclusion of another or his privacy affairs or concerns.'" *Ward I*, 9 F.4th at 362 (quoting Restatement (Second) of Torts § 652B (Am. L. Inst. 1977)). Unwanted phone calls are the "type of intrusive invasion of privacy" that this tort seeks to prevent. *Gadelhak*, 950 F.3d at 462; *see also Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191–92 (10th Cir. 2021) (unwanted "phone call poses the same kind of harm recognized at common law—an unwanted intrusion into a plaintiff's peace and quiet" (emphasis omitted)); *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653–54 (4th Cir. 2019) (unwanted phone calls are among the "types of harms protected at common law"); *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351–52 (3d Cir. 2017) (unwanted phone call "was of the same character" as intrusion upon seclusion); *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 93 (2d Cir. 2019) (harm from unwanted telemarketing text messages is "of the same character" as "invasions of privacy, intrusion upon seclusion, and nuisance" (quoting *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017)).

It is true that tort liability typically lies only when "telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff." *Gadelhak,* 950 F.3d at 462 (quoting Restatement § 652B cmt. d and collecting cases); *see also Salcedo v. Hanna*, 936 F.3d 1162, 1171 (11th Cir. 2019); *Susinno*, 862 F.3d at 351–52. So the single unwanted phone call Ward offers would not likely show the "substantial" and "strongly object[ionable]" intrusion upon his privacy that would make NPAS liable to him under the common law. *See Salcedo*, 936 F.3d at 1171 (quoting Restatement § 652B cmt. d). But that is not our question. In assessing Article III injuries, *Spokeo* tells us to look for a harm with a close relationship "in kind, not degree" to common law harms. *Gadelhak*, 950 F.3d at 462 (citing *Spokeo*, 578 U.S. at 341); *see also id.* at 463 n.2 ("the number of texts is irrelevant to the injury-in-fact analysis"); *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 822 (5th Cir. 2022) (focus is not on "level of harm" but whether harm "is similar in kind to a type of harm that

the common law has recognized as actionable"); *Krakauer*, 925 F.3d at 654 ("Our inquiry is focused on types of harms protected at common law, not the precise point at which those harms become actionable."); *Susinno*, 862 F.3d at 352.

Because the intrusion caused by unwanted phone calls bears a "close relationship" to the *kind* of harm that the common law sought to protect, it does not matter that the volume of such calls "may be too minor an annoyance to be actionable at common law." *Gadelhak*, 950 F.3d at 462–63, 463 n.2 (citation omitted). Congress may choose to "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Spokeo*, 578 U.S. at 341 (citation omitted). So Ward's one unwanted phone call is injury enough. Our sister circuits, when assessing injury-in-fact under the Telephone Consumer Protection Act, have largely agreed. *See Gadelhak*, 950 F.3d at 463 (five unwanted text messages sufficient for an Article III injury); *Krakauer*, 925 F.3d at 652–54 (two phone calls in one year created a concrete harm); *Susinno*, 862 F.3d at 351–52 (one unwanted phone call was a concrete harm); *Melito*, 923 F.3d at 93–94 (one unwanted text message was an Article III injury); *Van Patten*, 847 F.3d at 1042–43 (two unwanted text messages sufficient for Article III injury); *Cranor v. 5 Star Nutrition, LLC*, 998 F.3d 686, 690–93 (5th Cir. 2021) (single unwanted text was an injury in fact); *but see Salcedo*, 936 F.3d at 1173 (single unwanted text message too insignificant to create an Article III injury). And the Tenth Circuit has followed suit in the context of the FDCPA. *Lupia*, 8 F.4th at 1190–93 (single unwanted phone call created Article III standing under FDCPA).

NPAS protests that this reasoning does not apply in the context of the FDCPA. It argues that the TCPA and FDCPA "have different goals." Appellee Br. at 22. But this argument directly contradicts Congress's determination that both telemarketing and debt collection intrude on consumers' privacy. *See* 15 U.S.C. § 1692(a) ("Abusive debt collection practices contribute to . . . invasions of individual privacy."); Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5), 105 Stat. 2394, 2394 ("Unrestricted telemarketing . . . can be an intrusive invasion of privacy."). And just like the TCPA protects privacy through do-not-call lists, the FDCPA protects privacy through cease-and-desist letters. *See* 15 U.S.C. § 1692c(c) (cease-and-desist letters); 47 U.S.C. § 227(c)(1)(A) (authorizing regulations implementing do-not-call

systems); 47 C.F.R. § 64.1200(d) (do-not-call implementing regulation). So even though they accomplish their goals through different means, both statutes protect privacy rights.

NPAS further latches on to the different means of protection in each statute. It notes that under the FDCPA, communication with an unrepresented debtor is generally permitted, subject to time and place restrictions, *see* 15 U.S.C. § 1692c(a); so, it reasons, there can be no FDCPA injury—or, in standing terms, no "legally protected interest," *see Lujan*, 504 U.S. at 560—unless the debtor *effectively* conveys that he wants the communications to stop, *see* 15 U.S.C. § 1692c(c). Here, NPAS says that never happened because Ward's attorney mailed the cease-and-desist letter to the wrong address. But whether Ward effectively notified NPAS of his wishes goes to the merits of Ward's claim, not to standing. To have a "legally protected interest," Ward need show only that he "has a right to relief *if* the Court accepts [his] interpretation of the constitutional or statutory laws on which the complaint relies." *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 488 (6th Cir. 2021) (emphasis added) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89–90 (1998)). "[J]ust because a plaintiff's claim might fail on the *merits* does not deprive the plaintiff of *standing* to assert it." *Id.* at 489.

Ward's claim on the merits is that NPAS violated the FDCPA by using a shortened form of its name (NPAS) instead of its "true name" (NPAS, Inc.) in the voicemails, *see* 15 U.S.C. § 1692e(14); and by calling him after he sent a cease-and-desist letter, *see id.* § 1692c(a)(2) & (c).**³** True, the cease-and-desist letter never reached NPAS, so NPAS could not have known that Ward wanted the phone calls to stop. But Ward says that is because NPAS misled him by not using its "true name." Whether that is a valid theory under the statute, and these facts, is a merits question; the standing question assumes Ward's theory to be correct and asks only

---

**³**Ward also claims that NPAS violated the FDCPA by not meaningfully disclosing its identity as a debt collector under 15 U.S.C. § 1692d(6). Ward does not "even tr[y] to show . . . any actual harm beyond that 'bare procedural violation,'" so he lacks standing to bring that claim. *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018) (quoting *Spokeo*, 578 U.S. at 341); s*ee TransUnion*, 141 S. Ct. at 2208 ("Standing is not dispensed in gross; rather plaintiffs must demonstrate standing for each claim that they press.").

whether he suffered an Article III injury by receiving an unwanted phone call as a result. *See CHKRS*, 984 F.3d at 488. For the reasons discussed above, we conclude that he did.[4]

B.

Ward appeals the district court's grant of summary judgment, which we review de novo. *See Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 758 F.3d 777, 781 (6th Cir. 2014) (per curiam). Summary judgment is appropriate if the movant, here NPAS, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine issue of material fact when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"Liability under the FDCPA attaches only to a 'debt collector.'" *Kistner v. L. Offs. of Michael P. Margelefsky, LLC*, 518 F.3d 433, 435–36 (6th Cir. 2008) (citation omitted). And "not all who collect debts are 'debt collectors' for the purposes of the [FDCPA]." *Harris v. Liberty Cmty. Mgmt., Inc.*, 702 F.3d 1298, 1302 (11th Cir. 2012). The district court held that NPAS is not a debt collector, so it could not be liable for any of the FDCPA violations Ward alleges. We agree.

The FDCPA defines a debt collector as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). But the statute also expressly excludes "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained." *Id.* at § 1692a(6)(F)(iii). So, in order for NPAS to be a debt collector,

---

[4]NPAS also contends that Ward failed, at the summary judgment stage, to produce facts to support the amended complaint's allegations that he found the March 14, 2019 phone call intrusive. *See Lujan*, 504 U.S. at 561. But Ward did send a "cease and desist" letter, albeit to the wrong address, which is evidence that he found the phone calls unwelcome. And when asked at his deposition: "Has your life changed at all as a result of communications with NPAS, Inc.?" Ward answered: "As far as them constantly calling me. I didn't have that before I met them," which also suggests that the calls were unwelcome.

Ward's debts to Stonecrest had to be in default on October 3 and December 22, 2018, when Stonecrest referred the bills to NPAS.

The statute does not define "default." Neither does this court's caselaw. But dictionaries do; and so does the parties' contract. Start with the dictionary. The parties rely heavily on Black's Law Dictionary, which defines "default" as the "omission or failure to perform a legal or *contractual duty*; esp., the failure to pay a debt when due."[5] *Default*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). So, by definition, the terms of a default are set either by legal command (for example, a statute or regulation), or by the parties' agreement itself. Here, no statute or regulation gives us a default date, so we look to the contract. *See Willison v. Nelnet, Inc.*, 850 F. App'x 389, 391–92 (6th Cir. 2021) (relying in part on the terms of a service agreement to find that plaintiff's debt was not in default at the time of defendant's acquisition); *De Dios v. Int'l Realty & Invs.*, 641 F.3d 1071, 1074 (9th Cir. 2011) (When deciding whether debt was in default at the time of acquisition, courts "look to any underlying contracts . . . governing the debt at issue."); *see also Wagoner v. NPAS, Inc.*, 456 F. Supp. 3d 1030, 1039 (N.D. Ind. 2020) ("[I]t makes little sense not to consult and enforce contracts to determine when debts are in default."); *Prince v. NCO Fin. Servs., Inc.*, 346 F. Supp. 2d 744, 748 (E.D. Pa. 2004) (gathering cases looking to statutes and contracts to determine whether an account was in default under the FDCPA).

The parties' contract, the Conditions of Admission, states that "[d]uring the time that the medical account is being serviced by the EBO Servicer, the account shall not be considered delinquent, past due or in default, and shall not be reported to a credit bureau or subject to collection legal proceedings." And that Stonecrest would not "determine the account to be delinquent, past due and in default" until NPAS gave notice to Ward and returned the debt to Stonecrest. So, according to the contract terms, Ward's debt was not in default during the time

---

[5]Other dictionaries offer similar definitions. Take, for example, Merriam-Webster: "failure to do something required by duty or law," or "a failure to pay financial debts," *Default*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY (2022), and the Oxford English Dictionary: "In a state of having failed to fulfil a legal requirement or obligation, esp. of having failed to appear in a court of law or to make a payment that is due," *In default*, OXFORD ENGLISH DICTIONARY (Oxford Univ. Press 2022).

that NPAS held it. And neither was it "past due" or "delinquent." NPAS says this language resolves the case.

Not quite. The statute exempts only those debts that were "not in default at the time [they were] obtained." 15 U.S.C. § 1692a(6)(F)(iii). So, if Ward's debt was "in default" *before* NPAS obtained it, the fact that it became "not in default" *once* NPAS obtained it should not matter. *See Willison*, 850 F. App'x at 391 ("We have held that 'a loan servicer . . . can . . . become a debt collector, depending on whether the debt was assigned for servicing before the default or alleged default occurred.'" (quoting *Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 359 (6th Cir. 2012))). Ward attempts to show that he defaulted before NPAS acquired his debt; but his efforts come up short. Ward says that "to be 'in default' means to have failed to fulfil one's obligation to pay money, i.e. to have breached the contract creating the debt." Appellant Br. at 19. Ward says he breached (or defaulted) the day after he received, and failed to pay, the Stonecrest statements marked "due on receipt," weeks before NPAS acquired his debt. But even assuming that any "breach" is synonymous with "default," there is nothing in the record to suggest that Ward's failure to pay immediately would be treated as a breach. The statements didn't say that. And Stonecrest didn't treat Ward's failure to pay immediately as a breach either. Indeed, for eighty days on the first account and sixty days on the second, Stonecrest just waited for Ward to pay. Then it sent the debt to NPAS, who sent Ward statements with due dates that were ten to fifteen days out, with no interest charged. And while NPAS had the debt, Stonecrest agreed that it would not consider Ward's account to be "delinquent, past due or in default." That was a valuable promise. Until NPAS gave notice to Ward and returned the account to Stonecrest, Stonecrest committed that it would not exercise legal rights associated with a breach of a promise to pay. It would not collect late fees or interest, refer the debt to a collection agency, or report it to a credit bureau, and it would not sue. *Cf. Alibrandi v. Fin. Outsourcing Servs., Inc*, 333 F.3d 82, 87 (2d Cir. 2003) (per curiam) (declining to hold that FDCPA "default occurs immediately after payment becomes due" to avoid "the paradoxical effect of immediately exposing debtors to the sort of adverse measures, such as acceleration, repossession, increased interest rates, and negative reports to credit bureaus, from which the Act intended to afford debtors a measure of protection").

Per the terms of the agreement, Ward's account was not "delinquent, past due or in default" while NPAS held the account. And there is nothing in the record to suggest that Stonecrest considered Ward's account to be in default before it referred it to NPAS. We have held that a "debt collector" is one who "either acquired a debt in default or has treated the debt as if it were in default at the time of acquisition." *Bridge*, 681 F.3d at 362. Here, no one—neither Stonecrest, nor NPAS—treated Ward's debt as if it were in default at that time. We agree with the district court that NPAS is not a debt collector under the FDCPA.

* * *

For the reasons set forth above, we AFFIRM the district court's grant of summary judgment.