RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0123p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

FREDDIE GARLAND,

        *Plaintiff-Appellant*,

    *v.*

ORLANS, PC; LINDA M. ORLANS; ALISON ORLANS,

        *Defendants-Appellees*.

No. 20-1527

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:18-cv-11561—Denise Page Hood, Chief District Judge.

Argued: March 10, 2021

Decided and Filed: May 28, 2021

Before: McKEAGUE, GRIFFIN, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:** Andrew J. McGuinness, ANDREW J. MCGUINNESS, ESQ., Ann Arbor, Michigan, for Appellant. I.W. Winsten, HONIGMAN LLP, Detroit, Michigan, for Appellees. **ON BRIEF:** Andrew J. McGuinness, ANDREW J. MCGUINNESS, ESQ., Ann Arbor, Michigan, for Appellant. I.W. Winsten, Andrew W. Clark, HONIGMAN LLP, Detroit, Michigan, for Appellees.

─────────────────

## OPINION

─────────────────

NALBANDIAN, Circuit Judge. Orlans, PC, a law firm acting on behalf of Wells Fargo Home Mortgage Inc., sent a letter on law-firm letterhead to Freddie and Linda Garland. The letter said Wells Fargo had referred the Garlands' loan to Orlans for foreclosure. But the letter

also said that "[w]hile the foreclosure process ha[d] begun," "foreclosure prevention alternatives" might still be available if the Garlands reached out to Wells Fargo. (R. 1, Letter, PageID 28.) It informed the Garlands that Wells Fargo might have already sent a letter about possible alternatives, and it explained how the Garlands could contact Wells Fargo "to attempt to be reviewed for possible alternatives to foreclosure." (*Id.*) The letter's signature was typed and said, "Orlans PC." (*Id.*)

Freddie Garland says that the letter confused him because he was unsure if it was from an attorney. And he says that the letter "raised [his] anxiety" by suggesting "that an attorney may have conducted an independent investigation and substantive legal review of the circumstances of his account, such that his prospects for avoiding foreclosure were diminished." (R. 1, Complaint, PageID 9.)

Garland alleges that Orlans sent a form of this letter to tens of thousands of homeowners and that it did so without having any attorney provide a meaningful review of the homeowners' foreclosure files, so the communications deceptively implied they were from an attorney. Both the Fair Debt Collection Practices Act (FDCPA) and Michigan's Regulation of Collections Practices Act (RCPA) prohibit misleading debt-collection communications that falsely represent or imply they are from an attorney. Garland brought class-action claims under both acts against Orlans and its principals.[1]

The district court dismissed Garland's FDCPA claim and declined to exercise supplemental jurisdiction over his RCPA claim. We **AFFIRM**, but on grounds that differ from those articulated by the district court. Simply put, Garland lacks standing to assert either of his claims, so we lack jurisdiction.

I.

To sue in federal court, a plaintiff must have standing under Article III of the Constitution, which "limits the judicial power to resolving actual 'Cases' and 'Controversies.'" *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 860 (6th Cir. 2020). The oft-repeated

---

[1]We refer to the defendants collectively as Orlans.

constitutional standing test has three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Garland runs into trouble under the first two factors.

### A.

To have standing, a plaintiff must have suffered an injury in fact—"an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted). Garland's complaint asserts that Orlans violated the RCPA and FDCPA by sending misleading letters that confused him and made him anxious. None of the "injuries" that we can tease out of Garland's complaint satisfy standing's concreteness requirement.

Garland's complaint alleges statutory violations that led to confusion and increased anxiety. The FDCPA and the RCPA both create causes of action against collectors who violate their provisions. One might think that a clear statutory directive to open the doors to court would be enough for standing. Not so. Because standing is a constitutional requirement, the fact that a statute purports to create a cause of action does not in isolation create standing. A plaintiff asserting a procedural claim (like an FDCPA violation) cannot bring a claim unless she has suffered a concrete injury of some kind.

In *Spokeo*, the Supreme Court addressed the concrete-injury requirement and said three important things for resolving the question of concreteness in Garland's case. First, the Court explained that although concrete injuries are "'real' and not 'abstract,'" they are not necessarily tangible—intangible injuries can sometimes be concrete. *Spokeo*, 136 S. Ct. at 1548 (citations omitted).

Second, the Court crafted a framework for examining whether intangible injuries are concrete. *Id.* at 1549. When trying to determine whether an intangible injury qualifies, *Spokeo* says that we should look to history and congressional judgment. *Id.* If an "alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis

for a lawsuit," then it is likely sufficient.  *Id.*  Similarly, where Congress says a harm satisfies Article III, the harm likely does for two reasons: 1) "Congress is well positioned to identify intangible harms that meet minimum Article III requirements," and 2) Congress has the power to permissibly make some injuries "previously inadequate in law" constitutionally "cognizable." *Id.* (citation omitted).  The Court, however, was quick to note that Congress's "role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize" suit. *Id.*

Third, *Spokeo* specifically explained how courts should deal with plaintiffs who allege a violation of a statute that purports to create a cause of action. Statutory violation plaintiffs can show concrete injury in one of two ways.  *Id.*  First, a plaintiff can show a concrete harm (if intangible, using the principles just explained) flowing from the violation.  *See id.*  Second, in some cases a plaintiff could show that the procedural violation alone was enough with no other showing of harm.  *Id.*  But the Court limited this second category to cases in which a plaintiff can show 1) that Congress created the statutory right to protect a concrete interest (if intangible, applying the principles just explained) and 2) the violation creates a "risk of real harm" to that concrete interest.  *Id.*

Thus under *Spokeo*, Garland has standing if his complaint sufficiently alleges that 1) Orlans's suspected FDCPA and RCPA violations caused him concrete harm or 2) the violations in and of themselves create standing because Congress "conferred the procedural right to protect a plaintiff's concrete interests and the procedural violation presents a material risk of real harm to that concrete interest." *Macy v. GC Servs. Ltd. P'ship*, 897 F.3d 747, 756 (6th Cir. 2018). We need only address the first possibility because Garland's complaint did not allege that the violations are enough in isolation due to risk of harm.  *Compare Macy*, 897 F.3d at 761 (explaining that "a risk-of-harm analysis" is unnecessary when "no risk of harm was alleged"), *with Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 251 (6th Cir. 2020) (explaining that a risk-of-harm analysis was necessary "because Donovan's alleged injury is based on the risk" of harm (emphasis omitted)).  And the risk-of-harm inquiry is the only way under *Spokeo* to show that a statutory violation by itself is a concrete injury.  136 S. Ct. at 1549.

So the question that we resolve is whether Garland has sufficiently alleged that the statutory violations caused him individualized concrete harm.  And here his allegations come up short. Garland's alleged injuries are not concrete enough to support standing. Garland's complaint alleges two injuries—confusion and anxiety.  Both are intangible, so we analyze them under *Spokeo*'s intangible-harm framework.

We can dispense with confusion easily under *Spokeo*. Confusion does not have "a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit." *Spokeo*, 136 S. Ct. at 1549.  And Garland has not shown us that anything in the RCPA and FDCPA suggests that the legislatures[2] intended to make confusion cognizable.  We have no difficulty joining the Seventh Circuit in holding that "the state of confusion is not itself an injury." *Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1068 (7th Cir. 2020).

The anxiety analysis is not as easy, but Garland's anxiety allegation also fails.  This is not the first time this court has considered an attorney-letterhead allegation of anxiety.  In *Buchholz*, this court held that a similar attorney-letterhead plaintiff lacked standing because 1) fear of future harm not certainly impending is not an injury in fact and 2) his injury was not traceable to the defendant's conduct.  946 F.3d at 865-67.  In that case, the panel majority also questioned whether a bare allegation of anxiety could be a concrete injury-in-fact at all.  *Id.* at 863-65. Though we did not answer that question in *Buchholz*, today we do.

The plaintiff in *Buchholz*, Gustav Buchholz, received two letters from a law firm (on firm letterhead and signed by an attorney) that said a bank had retained the firm to collect two debts. *Id.* at 859-60. The letters did not threaten legal action.  *Id.* at 860.  Buchholz sued, alleging that the firm processed too many collection letters to have meaningfully reviewed the claims against him and "the letters made him feel anxious and fear that [the firm] would sue him if he did not promptly pay."  *Id.* at 859.  He did not dispute the debts.  *Id.*

---

[2]*Spokeo* speaks only to the judgment of the United States Congress that a harm should be cognizable before federal courts.  So it is unclear what role (if any) state legislatures play in the *Spokeo* framework.  We need not closely analyze this riddle here though because it does not appear that either legislative body intended to make confusion a compensable harm.

Faced with these facts, the *Buchholz* panel held that Buchholz did not have standing. In so doing, it made three noteworthy moves. First, it expressed doubt that a "bare allegation of anxiety" could ever qualify as a concrete injury. *Id.* at 863. An unadorned assertion of anxiety seemed unlike any cognizable common-law harm, and the panel was "reluctant to find that" the Supreme Court's conclusion "that an allegation of a 'bare procedural violation' cannot satisfy Article III" could "be undone by the simple addition of one word to a pleading." *Id.* at 865; *see also Thomas v. TOMS King (Ohio), LLC*, — F.3d —, No. 20-3977, 2021 WL 1881380, at *3 (6th Cir. May 11, 2021) ("After *Spokeo*, we know there is no such thing as an 'anything-hurts-so-long-as-Congress-says-it-hurts theory of Article III injury.'" (quoting *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 463 (6th Cir. 2019))). Second, it determined that Buchholz's alleged anxiety was not an injury in fact because fear of future harm is cognizable only when the feared harm is "certainly impending." *Buchholz*, 946 F.3d at 865 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). Buchholz's injury wasn't sufficient because he only alleged fear that the law firm might sue *at some point* in the future *if he did not pay. Id.* He had not alleged that the letter threatened suit or that he would not pay the debt; he had merely alleged a fear of something that might or might not happen. *Id.* at 865. Third, the panel went through the *Spokeo* intangible-injury framework to reach the same conclusion—the letter had not caused Garland a concrete intangible harm.[3]

*Buchholz* and *Spokeo* create an insurmountable barrier for Garland because a bare allegation of anxiety is not a cognizable, concrete injury. *Buchholz* all but reaches this conclusion. *See* 946 F.3d at 864-65 ("Buchholz's failure to allege anything other than anxiety makes us skeptical about whether he has established an injury in fact. . . . Nevertheless, we need

---

[3]Although some parts of *Buchholz* appear framed as if the panel intended to analyze whether the procedural violation in isolation was concrete enough to be an injury in fact, the decision never gets to the *Spokeo* risk-of-harm analysis required to assess whether a procedural violation in isolation counts as a concrete injury. *See Macy*, 897 F.3d at 756 (explaining that there is a concrete injury under *Spokeo* "where the violation of a procedural right granted by statute is sufficient in and of itself . . . because Congress conferred the procedural right to protect a plaintiff's concrete interests and the procedural violation presents a material risk of real harm to that concrete interest"). Rightfully so. Buchholz had only alleged that the FDCPA violation had caused him a personal concrete—although intangible—harm. *Buchholz*, 946 F.3d at 859 ("[H]e alleges that the letters made him feel anxious and fear that [the law firm] would sue him . . . ."). And so the *Buchholz* panel did not need to do the risk-of-harm analysis for the same reason we decline to do so today; the complaint did not allege the statutory violation should be enough given a real risk to a congressionally contemplated harm. *See Macy*, 897 F.3d at 761 (stating that "a risk-of-harm analysis" is unnecessary when "no risk of harm was alleged").

not decide whether a bare anxiety allegation, in the abstract, fails to satisfy the injury-in-fact requirement."). And we now close the loop *Buchholz* left open. A bare anxiety allegation is not the key to federal court for three reasons.

First, a bare allegation of anxiety is an intangible harm *without* "a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit." *Spokeo*, 136 S. Ct. at 1549. *Buchholz*'s reasoning on this point is persuasive. *See* 946 F.3d at 863-65. While it is true that one could classify some forms of cognizable common-law harms as "anxiety," there is only a loose nexus between common-law harms and a bare allegation of anxiety for a simple reason. Anxiety—a form of emotional harm—comes in many different shapes and sizes, and so a bare allegation of anxiety doesn't tell us much. Some forms of anxiety or emotional harm are cognizable under the common law, but others are not. And this distinction appears to turn on both the defendant's conduct giving rise to the anxiety and the anxiety's severity.

As described in *Buchholz*, the closest common-law analogues about "psychological injuries" emphasize the "extreme" or "outrageous" nature of the underlying conduct causing the harm.[4] 946 F.3d at 864 (citation omitted). And that severely curtails the harms cognizable at common law by defining that harm narrowly. While "[a] great deal of conduct may cause emotional harm, . . . the requisite conduct for [these potential common-law analogues]—extreme and outrageous—describes a very small slice of human behavior." *Id.* (first alteration in original) (quoting Restatement (Third) of Torts: Physical & Emotional Harm § 46 cmt. a (Am. L.

---

[4]In some ways, it may seem odd to discuss the underlying conduct giving rise to a claim in analyzing whether a "harm" is closely related to one sufficient at common law. *Spokeo*, 136 S. Ct. at 1549. But when setting forth the intangible-harm framework, *Spokeo* uses the term "harm" in a broad sense to refer to actionable injury—an injury that "has traditionally been regarded as providing a basis for a lawsuit." *Id.* That concept turns both on a defendant's conduct and how that conduct impacts a plaintiff. *See id.* (noting Congress's ability to "define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before" thus elevating those injuries "to the status of legally cognizable" when describing the "intangible harm" analysis (citations omitted)); *id.* (noting "Congress is well positioned to identify intangible harms" when it crafts statutory causes of action); *id.* (grounding the common-law-analogue inquiry in "the case-or-controversy requirement"); *see also Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931-32 (11th Cir. 2020) (en banc) (analyzing whether FACTA violation was similar to the "common-law breach of confidence tort" by looking to the elements of that tort such as the *disclosure* of information to a third party); *Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 114 (3d Cir. 2019) (analyzing whether a procedural violation had a close relationship with "common law privacy torts and an action for breach of confidence"). We are mindful of course, that the common-law analogue need not be on all fours with the statutory harm. So while these are relevant considerations, a plaintiff is not required to show that the alleged harm would have supported a common-law cause of action. A "close relationship" is all that is required. *Spokeo*, 136 S. Ct. at 1549.

Inst. 2012)). And a "bare procedural violation" does not fit on that small slice. *Id.* at 865 (citation omitted). Moreover, a general allegation of emotional harm like anxiety or distress falls "short of cognizable injury as a matter of general tort law," *id.* at 864, because "liability [for emotional harm] arises" "*only* where it is extreme," *id.* (quoting Restatement (Second) of Torts § 46 cmt. j (emphasis added)). A bare anxiety allegation says nothing about severity. Someone who feels slightly nervous has not suffered the type of severe emotional harm cognizable at common law. Were that so, "everyone would have standing to litigate about everything." *Brunet*, 982 F.3d at 1068.

Second, Garland has not shown us that anything in the RCPA and FDCPA suggests that the legislatures intended to make anxiety cognizable. Rather, he simply argues that the alleged violation here implicates a harm contemplated by Congress[5] because Congress intended the FDCPA to prevent abusive debt collection practices like communications that falsely imply they are from attorneys. But a legislature's attempt to prohibit a certain form of conduct—here, misleading communications—doesn't tell us anything about whether a legislature intended to elevate the intangible injury Garland alleges—anxiety—to make it a cognizable harm in federal court. Simply put, neither act creates a cause of action for anxiety.

Third, Garland's anxiety is too speculative to qualify as an injury in fact because it is merely a fear of a future harm that is not "certainly impending"—an injury insufficient under Supreme Court precedent. *Clapper*, 568 U.S. at 410. In his complaint, Garland claimed that the appearance that the Orlans letter was from an attorney "raised [his] anxiety" and "suggested . . . that an attorney may have conducted an independent investigation" of his case "such that his prospects for avoiding foreclosure were diminished." (R. 1, Complaint, PageID 9.) So his ultimate fear was foreclosure. But while the letter stated that the foreclosure process was underway, the letter (just like Buchholz's) threatened nothing. (R. 1, Letter, PageID 28.) In fact, the Orlans letter contained good news—although the foreclosure process is underway, *it may not be too late* to avoid foreclosure. So Garland's ultimate fear, foreclosure, was not "certainly impending." The whole point of the letter was that he might be able to avoid that fear.

---

[5]He does not make an argument about the harm contemplated by the Michigan Legislature when it passed the RCPA.

Because bare allegations of confusion and anxiety do not qualify as injuries in fact, Garland's injuries cannot create standing.

## B.

Garland's anxiety allegation also fails standing's traceability requirement. Standing requires "a causal connection between the injury and the conduct complained of," which means that the injury is "fairly . . . trace[able] to the challenged action of the defendant," not some "independent action of some third party." *Lujan*, 504 U.S. at 560 (alterations in original) (citation omitted). Self-inflicted injuries fail under this prong because they are, "by definition, . . . not traceable to anyone but the plaintiff." *Buchholz*, 946 F.3d at 866.

Garland's complaint runs into trouble under *Buchholz* here as well. In *Buchholz*, we held that Buchholz's allegations were self-inflicted and thus not traceable to the law firm's letter. *Id.* at 866-67. We explained that Buchholz did not dispute his debts or allege the letter contained inaccurate information. Rather, he had merely alleged that he was anxious about the possible consequences of refusing to pay his debts—possible legal action "*if* prompt payment was not made." *Id.* at 867 (citation omitted). And we concluded that "[t]he cause of that anxiety falls squarely on Buchholz because *he* chose not to pay his debts—and now fears the consequences of his delinquency. *Id.* So . . . the anxiety that Buchholz allege[d] is not traceable to anyone but him." *Id.* The only thing the letter had done was remind him that his creditors had not forgotten him. *Id.*

The substantial overlap between *Buchholz* and this case decides this issue. Garland, like Buchholz, owed a debt and faced possible consequences for failing to pay. Both received a letter. Buchholz's said that a firm had been retained to collect his debt. And Garland's said that the foreclosure process was underway and might be avoided. Both felt anxious. Buchholz worried that his creditor might sue if he didn't pay. And Garland feared foreclosure was more likely because of attorney involvement. The fear in both cases is rooted in the fact of default, not the letters received. As in *Buchholz,* Garland's letter didn't say anything to support the alleged fear. Just like Buchholz's letter did not threaten suit, Garland's said nothing that suggested that

foreclosure was more likely because of attorney involvement.  In fact, Garland's letter contained good news—foreclosure alternatives might be available.

Simply stated, "the anxiety [Garland] alleges is not because of anything [Orlans] wrote." *Id.*  Whether from the pen of an attorney or not, the letter said nothing that even remotely implied Garland's chance of avoiding foreclosure was "diminished."  (R. 1, Complaint, PageID 9.)  Indeed, the letter took no position on that issue; it just said alternatives might be available if Garland contacted his lender.

"The cause of" Garland's ultimate fear of foreclosure "falls squarely on" his own shoulders "because *he* chose not to pay his debts" and "fear[ed] the consequences of his delinquency."  *Buchholz*, 946 F.3d at 867.  Ultimately, Garland's anxiety, like Buchholz's, "is not traceable to anyone but him."  *Id.*  And so he "cannot establish standing based on his allegations of anxiety."[6]  *Id.*

II.

Because Garland lacks standing to assert his statutory claims, we lack jurisdiction. We **AFFIRM** dismissal.

---

[6] Garland's confusion allegation likely does not run into the same traceability problems.  But that possibility doesn't mean Garland has standing.  Confusion is insufficiently concrete to support standing for reasons already explained.