RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0182p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CARL WARD,

*Plaintiff-Appellant*,

*v.*

No. 20-5902

NATIONAL PATIENT ACCOUNT SERVICES SOLUTIONS, INC.,

*Defendant*,

NPAS, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:19-cv-00484—Aleta Arthur Trauger, District Judge.

Argued:  April 27, 2021

Decided and Filed:  August 16, 2021

Before:  MOORE, COLE, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Geoffrey C. Parker, HILTON PARKER LLC, Pickerington, Ohio, for Appellant.
Megan D. Meadows, SPENCER FANE LLP, St. Louis, Missouri, for Appellee.  **ON BRIEF:**
Geoffrey C. Parker, Jonathan L. Hilton, HILTON PARKER LLC, Pickerington, Ohio, for
Appellant.  Megan D. Meadows, Scott J. Dickenson, SPENCER FANE LLP, St. Louis, Missouri,
T. William A. Caldwell, ORTALE, KELLEY, HERBERT & CRAWFORD, Nashville,
Tennessee, for Appellee.

       COLE, J., delivered the opinion of the court in which GILMAN, J., joined.  MOORE, J.
(pp. 9–16), delivered a separate dissenting opinion.

---

**OPINION**

---

COLE, Circuit Judge.  Carl Ward brought this action under the Federal Debt Collection Practices Act ("FDCPA") against NPAS, Inc., a debt servicer that was hired by Stonecrest Medical Center to collect debts incurred by its patients, including Ward.  On appeal, NPAS, Inc. argues for the first time that the case should be dismissed because Ward lacks Article III standing.  We agree.

I.

Ward received medical treatment at Stonecrest in July and October 2018.  At the end of each visit, he owed a balance of $80.00.  Stonecrest tasked NPAS, Inc. with the job of collecting Ward's outstanding balance on each of his accounts.

NPAS, Inc. first sent Ward a billing statement on October 3 related to his July hospital visit.  The statement included Ward's account number, his dates of treatment, and a payment due date, and it instructed Ward to make a payment to Stonecrest.  NPAS, Inc. also provided its full name and address at the top of the first page of the statement.  On the reverse side, it explained who it was: "NPAS, Inc. is a company that is managing your account for the healthcare provider."  Next, NPAS, Inc. called Ward on October 24 and left the following voice message:

> We are calling from NPAS on behalf of Stone Crest Medical Center. Please return our call at 1-800-223-9899, Monday through Friday between 8:30 A.M. and 9:30 P.M. Eastern Standard Time and Saturday between 9:00 A.M. and 1:00 PM. Eastern Standard Time. Thank you. Hello, we are calling from NPAS on behalf of Stone Crest Medical Center. Please return our call at 1-800-223-9899, Monday through Friday between 8:30 A.M. and 9:30 P.M. Eastern Standard Time and Saturday between 9:00 A.M. and 1:00 PM. Eastern Standard Time. Thank you.

On November 17, NPAS, Inc. sent a second billing statement to Ward that was substantially similar to the first statement.  And on December 27, NPAS, Inc. left a second voice message, identical to the first.  After failing to collect a payment from Ward, NPAS, Inc. returned his account to Stonecrest.

Ward's second account regarding his October hospital visit followed a similar billing process.   NPAS, Inc. sent Ward an initial billing statement on December 22, containing materially the same information as the other statements.   On December 28, after retaining counsel, Ward sent a cease-and-desist letter to "NPAS Solutions, LLC," an entity unrelated to NPAS, Inc.   Because the two companies bore similar names, Ward stated at his deposition, NPAS, Inc.'s voice messages caused him to become confused as to which entity had called him. On February 4, 2019, NPAS, Inc. sent Ward a second billing statement, and on March 14, it left a voice message with Ward, identical to the previous two.   As with the first account, NPAS, Inc. returned the second account to Stonecrest.

Approximately two-and-a-half months after he received NPAS, Inc.'s final call, Ward filed the underlying action.   He alleged three violations of the FDCPA, all premised on NPAS, Inc.'s voice messages.   First, he claimed that NPAS, Inc. violated 15 U.S.C. § 1692e(11) by failing to identify itself as a debt collector in its voice messages.   Second, he claimed that NPAS, Inc. violated § 1692e(14) by failing to identify the "true name" of its business because it identified itself as "NPAS" rather than "NPAS, Inc.," which resulted in Ward becoming "confused" and sending a cease-and-desist letter to the wrong entity, NPAS Solutions, LLC. Finally, Ward alleged that NPAS, Inc.'s omission of its corporate designation in its voice messages also violated § 1692d(6) because NPAS, Inc. "place[d] telephone calls without meaningful disclosure of [its] identity."

At the close of discovery, NPAS, Inc. moved for summary judgment.   The district court granted summary judgment in favor of NPAS, Inc., holding that it did not qualify as a "debt collector" as defined under the FDCPA and was therefore not subject to the Act's requirements. Accordingly, the court dismissed the case in its entirety.   Ward timely filed this appeal.

II.

Although the issue of standing was raised for the first time on appeal, we have "an independent obligation to examine [our] own jurisdiction."   *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

Standing has three components: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Further, the plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the elements of standing. *Id.* To meet this burden, the plaintiff must "clearly allege facts demonstrating" each element. *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)) (cleaned up). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). On appeal from the grant of summary judgment, that means that the plaintiff cannot rely on mere allegations, but must also set forth specific facts demonstrating his standing. *Id.*; *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).

Here, the parties' arguments center on whether Ward has demonstrated injury in fact. The injury-in-fact requirement includes two sub-elements: the injury must be (1) particularized and (2) concrete. *Spokeo*, 136 S. Ct. at 1547–48. The parties do not dispute that NPAS, Inc.'s communications affected Ward personally, thereby satisfying the particularization requirement. *Id.* at 1548. Instead, this appeal centers on whether Ward suffered a concrete injury. Ward asserts two possible varieties of concrete injury. First, he contends that the violation of his procedural rights under the FDCPA alone constitutes a concrete injury. Second, he argues that the confusion he suffered, the expense of counsel, and the phone call that he received from NPAS, Inc. qualify as independent concrete injuries.

The Supreme Court has rejected the proposition that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 136 S. Ct. at 1549; *see also Thole v. U.S. Bank N.A*, 140 S. Ct. 1615, 1620 (2020) (explaining that the existence of a "cause of action does not affect the Article III standing analysis"). At the same time, the Court recognized that "the violation of a procedural right granted by statute can be sufficient in some circumstances to

constitute" concrete harm, even without asserting "any *additional* harm." *Spokeo*, 136 S. Ct. at 1549.

In the wake of *Spokeo*, the circuit courts developed different tests to determine whether the violation of a procedural right was sufficient to establish a concrete injury. *Compare Macy v. GC Servs. Ltd. P'ship*, 897 F.3d 747 (6th Cir. 2018), *with Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329 (7th Cir. 2019). In *Macy*, we held that the plaintiffs satisfied the concreteness requirement where "FDCPA violations created a material risk of harm to the interests recognized by Congress in enacting the FDCPA." 897 F.3d at 761.

Recently, the Supreme Court abrogated that holding, finding that "in a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm." *TransUnion*, 141 S. Ct. at 2210–11. Rather, plaintiffs must demonstrate that the "the risk of future harm materialized," or that the plaintiffs "were independently harmed by their exposure to the risk itself." *Id.* at 2011.

These cases emphasize a basic guidepost in our standing analysis: Ward does not automatically have standing simply because Congress authorizes a plaintiff to sue a debt collector for failing to comply with the FDCPA. *See Spokeo*, 136 S. Ct. at 1549. Ward must show either that the procedural harm itself is a concrete injury of the sort traditionally recognized or that the procedural violations caused an independent concrete injury.

A.  STATUTORY VIOLATION AS INTANGIBLE HARM

Ward argues that NPAS, Inc.'s statutory violations, without more, suffice to establish concrete injury.

As a preliminary matter, we note that Ward has not set forth any evidence to support his standing to sue under 15 U.S.C. § 1692e(11), and therefore, he has not satisfied his burden. *Lujan*, 504 U.S. at 561.

Instead, Ward relies on two other provisions of the FDCPA. First, he contends that NPAS, Inc.'s voice messages violated § 1692d(6), which provides that a "debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any

person in connection with the collection of a debt[,]" including the "placement of telephone calls without meaningful disclosure of the caller's identity." Because NPAS, Inc. identified itself as "NPAS," not "NPAS, Inc.," Ward claims that it violated this requirement. Second, and based on the same voice messages, Ward claims that NPAS, Inc. violated § 1692e(14), which provides that a "debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt[,]" including "us[ing] any business, company, or organization name other than the true name of the debt collector's business, company, or organization." In sum, he argues that the FDCPA created an enforceable right to know who is calling about a debt and that NPAS, Inc.'s failure to identify its full name concretely injured him.

To establish that the statutory violations here constitute concrete injury, Ward must show that NPAS, Inc.'s failure to disclose its full identity in its voice messages resembles a harm traditionally regarded as providing a basis for a lawsuit. *TransUnion*, 141 S. Ct. at 2204. A common-law or historical analogue need not be an "exact duplicate" to make this showing. *Id.* at 2209. Ward contends that NPAS, Inc.'s statutory violation is closely related to the harm of "invasion of privacy." Actions to enforce the "right of privacy" have long been litigated in American courts, and the tort of intrusion upon one's right to seclusion is recognized in most states. *See* Restatement (Second) of Torts § 652A (1977). And one of the purposes of the FDCPA is to stop abusive debt collection practices that contribute to "invasions of individual privacy." 15 U.S.C. § 1692.

But comparing Ward's alleged harm with the harm of invasion of privacy reveals why the latter is not an adequate historical analogue. Ward alleged that NPAS, Inc. failed to state its full name in voice messages, in violation of the FDCPA. Failing to receive full and complete information does not closely resemble intrusion upon seclusion, which generally requires a plaintiff to demonstrate that a defendant "intentionally intrude[d], physically or otherwise, upon the solitude or seclusion of another or his privacy affairs or concerns." Restatement (Second) of Torts § 652B (1977). Had Ward claimed, for example, that NPAS, Inc. improperly shared personal information with a third party, 15 U.S.C. § 1692b, publicized his debts, *id.* § 1692d(3)–(5), or used language on a publicly viewable envelope that would identify him as a debtor, *id.* § 1692f(8), then Ward's alleged harm would more closely resemble an invasion of

privacy. By contrast, the mere failure to provide certain information does not mirror an intentional intrusion into the private affairs of another. Indeed, Ward alleged in his complaint that NPAS, Inc.'s violation, i.e., the use of an abbreviated name, confused him, not that it invaded his privacy.

Because the procedural injuries Ward asserts do not bear a close relationship to traditional harms, we conclude that he cannot demonstrate standing based upon the statutory violations alone.

B. INDEPENDENT CONCRETE HARM

Even if the bare procedural violation of the FDCPA alone is insufficient to establish standing, Ward may still have standing if he can show a concrete injury that "flow[ed] from [the] statutory violation[.]" *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 862 (6th Cir. 2020). Ward has three possible arguments in this regard.

First, Ward alleges in his complaint that he became confused by NPAS, Inc.'s statutory violation and mailed a cease-and-desist letter to the wrong entity. During his deposition, Ward supported these allegations by testifying that the harm that he suffered was confusion. This argument fails because, as we have held before, confusion alone is not a concrete injury for Article III purposes. *Garland v. Orlans, PC*, 999 F.3d 432, 437–38 (6th Cir. 2021); *see also Pennell v. Global Tr. Mgmt., LLC*, 990 F.3d 1041, 1045 (7th Cir. 2021).

Second, Ward contends that he suffered concrete harm because NPAS, Inc.'s voice messages caused him to retain counsel to prevent NPAS, Inc. from making further calls. His asserted harm is the economic expense of retaining counsel. But applying Ward's logic to any plaintiff who hires counsel to affirmatively pursue a claim would nullify the limits created under Article III. *Duncan v. Liberty Mut. Ins. Co.*, No. 19-1796, 2021 WL 1383245, at *15 (6th Cir. Apr. 13, 2021) ("If the voluntarily incurred expenses of bringing a suit . . . could be used by themselves to show [concrete injury], this element of Article III standing would always be satisfied by any plaintiff who incurs legal expenses."). Therefore, Ward cannot show concrete harm simply by pointing to the cost of hiring counsel.

Third, to the extent that Ward argues on appeal that the harm he suffered was the single voice message he received after he sent a cease-and-desist letter to the wrong entity, he did not "clearly allege" that harm in his complaint. *Spokeo*, 136 S. Ct. at 1547. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the elements of standing. *Id.* at 1548. Because Ward did not clearly assert in his complaint that he received—let alone was harmed by—an additional phone call, we need not decide whether an unwanted call might qualify as a concrete injury. *Cf. Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 463 (7th Cir. 2020).

## III.

Because Ward has failed to show more than a bare procedural violation of the FDCPA, he does not have standing to bring his claims, and the district court lacked subject-matter jurisdiction to address them. A "dismissal for lack of subject matter jurisdiction should normally be without prejudice." *Thompson v. Love's Travel Stops & Country Stores, Inc.*, 748 F. App'x 6, 11 (6th Cir. 2018). Accordingly, we vacate the district court's order entering summary judgment and remand the case with instructions that it be dismissed for lack of jurisdiction.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting.  Carl Ward claims that NPAS, Inc. ("NPAS") violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, by misidentifying itself in multiple voicemails that it left for Ward concerning a purported medical debt.  According to Ward, NPAS's violations of the FDCPA did not merely create a *risk* of harm to Ward in the form of continued harassing calls and voicemails; he claims that the risk *materialized* when the misleading identification caused Ward to assert his right to be free of harassing debt-collection calls against the wrong entity, leading to at least one further voicemail from NPAS.  Ward's asserted harm, which finds support in the record, is sufficiently concrete to establish Ward's standing to sue.  Accordingly, I respectfully dissent from the majority's dismissal of this case for lack of jurisdiction.

Congress enacted and President Jimmy Carter signed into law the FDCPA in response to "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors."  15 U.S.C. § 1692(a).  Finding that "[a]busive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy," *id.*, legislators crafted a comprehensive statutory scheme designed to "eliminate abusive debt collection practices," *id.* § 1692(e).  Among the constraints that Congress imposed upon debt collectors are those that Ward invokes here.  First, there is 15 U.S.C. § 1692d, which prohibits "any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt," including "the placement of telephone calls without meaningful disclosure of the caller's identity."  *Id.* § 1692d(6).  Second, there is 15 U.S.C. § 1692e, which provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt," including "[t]he use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization."  *Id.* § 1692e(14).  According to Ward, NPAS misidentified itself, in violation of these provisions, in a series of

voicemails that he received from NPAS on October 24, 2018, December 27, 2018, and March 14, 2019.

The question here, however, is not whether NPAS's conduct violated the FDCPA. Instead, it is whether that conduct caused Ward to suffer an "injury in fact," such that Ward has standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). More specifically, the question is whether the record supports Ward's argument that he suffered a "concrete" harm—i.e., a harm that is "real, and not abstract"—as is required for standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (internal quotation marks omitted). Evidence of a tangible injury—physical or monetary harm, most obviously—would get the job done. *See id.* at 1549. But so could an intangible injury, at least in certain circumstances. *See id.* Ward's asserted harm falls into the latter category. He maintains that NPAS's misidentification caused him to send a cease-and-desist letter, *see* 15 U.S.C. § 1692c(c), to the wrong entity, resulting in at least one further harassing voicemail. That harm is a concrete one, as I shall now explain.

Until recently, the Court's clearest guidance on how to determine whether an intangible harm was nevertheless concrete for standing purposes came from *Spokeo*. The Court explained that, to determine whether an intangible harm is sufficiently concrete, "both history and the judgment of Congress play important roles." 136 S. Ct. at 1549. Thus, where an asserted intangible harm resembles, at least to some extent, one recognized in historical practice or the common law, it will suffice for standing purposes. *See id.* at 1549–50 ("Because the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts."). Concluding that the Ninth Circuit had not applied the correct concreteness standard, the Court remanded to the lower court so that it could apply the correct analysis in the first instance. *Id.* at 1550. The Court did, however, take the time to explain that "the *risk* of real harm can[] satisfy the requirement of concreteness." *Id.* at 1549 (emphasis added). The Court explained that, accordingly, "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In other

words, a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." *Id.* Based on the Court's language, this court (like others) held that the violation of a statutory procedural right "is sufficient, in and of itself, to constitute a concrete injury in fact" if "Congress conferred the procedural right to protect a plaintiff's concrete interests and the procedural violation presents a material risk of real harm to that concrete interest." *Macy v. GC Servs. Ltd.*, 897 F.3d 747, 756 (6th Cir. 2018).

But the Court elaborated upon *Spokeo* in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), correcting apparent misconceptions regarding the work that *Spokeo* was doing. The case was a class action brought under the Fair Credit Reporting Act ("FCRA"), and involved three claimed violations: that TransUnion failed to (1) use "reasonable procedures" to ensure the accuracy of its credit reports; (2) include all the requisite information in requests for credit files; and (3) include a correctly formatted summary of rights in correspondences. *Id.* at 2202. In essence, the class argued that TransUnion's failure to use reasonable procedures led to an inaccuracy in their credit reports—namely, that the class member was a "potential match" to an individual on a Treasury Department list of national security threats (e.g., terrorists or drug traffickers)—and that TransUnion failed to adhere to FCRA formatting requirements in follow up (and other) communications. *Id.* at 2201–02. The class succeeded at trial, but standing became the primary issue on appeal. *See id.* at 2202.

Beginning with the first claim, the Court concluded that those class members who had their inaccurate credit reports disclosed to third parties had suffered a concrete harm by analogizing to the intangible "reputational harm associated with the tort of defamation." *Id.* at 2208. TransUnion had argued that these class members' harm was not sufficiently analogous to the harm associated with defamation because the statement at issue—that the class member was merely a "*potential* match"—was not literally false as required at common law. *Id.* at 2209. But the Court rejected that argument, reasoning that it would "not require an exact duplicate" and that the harm bore "a sufficiently close relationship to the harm from a false and defamatory statement" despite perhaps being lesser in degree. *Id.* As for those class members for whom there was no proof that their inaccurate credit reports had been disclosed, however, the Court concluded that they had not suffered a concrete injury. *Id.* at 2212–13. Without something

resembling publication, from which a reputational harm would stem, the Court reasoned that the harm that these class members asserted—the mere *existence* of inaccurate information in their file—did not resemble a historically recognized harm. *Id.* at 2209–10. The Court also rejected the argument that the *risk* that TransUnion could have disclosed the inaccurate report, standing alone, was sufficiently concrete to confer standing. *Id.* at 2211. It explained that *Spokeo*'s reference to a risk of harm possibly being concrete was cabined to claims for injunctive or declaratory relief and could not "demonstrate Article III standing in a suit for damages." *Id.* Because the majority of the class had not demonstrated that the risk of harm "materialized," they lacked standing. *Id.*

Turning from the class's reasonable-procedures claim, the Court analyzed the other two claims as one. After noting that the requirements at issue—full disclosure and the summary of rights—"are designed to protect consumers' interests in learning of any inaccuracies in their credit files so that they can promptly correct the files before they are disseminated to third parties," the Court criticized the class for failing to present evidence that any of their number had opened, let alone been confused or misled by TransUnion's communications. *Id.* at 2213. The Court again concluded that the *risk* that the communications would prevent a class member from exercising their rights to correct their file, in the absence of evidence that the risk had materialized, was not a concrete harm for standing purposes. *Id.* The sole exception was the named plaintiff, who, the evidence established, had been frustrated in his efforts to correct his file by the formatting of TransUnion's correspondence (and whose standing apparently was unchallenged on appeal). *Id.* at 2201–02, 2213 n.8.

So where do things stand after *TransUnion*? It appears that, despite *Spokeo*'s suggestion, a risk of harm is not sufficient, in and of itself, to be a concrete injury for standing purposes in a suit for damages (although it could be in a suit for injunctive or declaratory relief). *TransUnion*, 141 S. Ct. at 2211. But where that risk of harm "materializes," a concrete harm has occurred so long as that harm resembles one recognized in historical practice. *Id.* at 2209–11. Crucially, *TransUnion* suggests that the resemblance required is one of *kind*, not *degree*—even if a harm is less *severe* than one that would be actionable under the common law, it will nevertheless be concrete if it is similar in kind. (Thus, while common-law defamation requires literal falsity,

a statutory harm predicated on the disclosure of merely misleading information is sufficiently analogous for the concreteness inquiry. *Id.* at 2208–09.) This (correct) reading of *TransUnion* fits neatly with the Court's recognition that "Congress may 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *Id.* at 2204–05 (quoting *Spokeo*, 136 S. Ct. at 1549). So long as the harm in question is in any sense "real"—no matter how seemingly insignificant—the question is no longer one of standing; instead it becomes a question of policy for the politically accountable branches to determine whether that harm should be afforded a cause of action to remedy it. *See id.* And courts should be careful not to stray beyond their prescribed role in this dynamic, lest they intrude upon Congress's authority to elevate previously inadequate—but nevertheless concrete—harms and unwittingly upend the balance of powers from which standing doctrine arises. *See id.* at 2203 ("The 'law of Art. III standing is built on a single basic idea—the idea of separation of powers.'" (quoting *Raines v. Byrd*, 521 U.S. 811, 820 (1997)).

Having set forth the relevant precedent, I turn back to Ward. Ward avers that in an October 24, 2018 voicemail, NPAS identified itself only as "NPAS"—not "NPAS, Inc." as it should have under the FDCPA—and that he received substantially similar voicemails on December 27, 2018, and March 14, 2019. Appellant's Supp. Br. at 3–4. He argues that NPAS's misidentification created a material risk that Ward would be unable to exercise his rights under the FDCPA—specifically, his right to have NPAS cease its debt-collection efforts at Ward's written request. *See* 15 U.S.C. § 1692c(c); Appellant's Supp. Br. at 3–4. More than that, however, Ward contends that this risk in fact materialized when Ward sent a cease-and-desist letter under § 1692c(c) to the wrong entity—he sent his letter to "NPAS Solutions, LLC," not "NPAS, Inc." in December 2018—resulting in at least one further voicemail (the March 14, 2019 voicemail). Appellant's Supp. Br. at 3–4.

Ward argues, and I agree, that the single voicemail he received after NPAS's misidentification resembles a harm recognized under the common-law tort of intrusion upon seclusion. *Id.* at 9. Historically, unwanted telephone communications would not be an actionable harm under an intrusion-upon-seclusion theory until the calls were "repeated with such persistence and frequency as to amount to . . . hounding." *Susinno v. Work Out World Inc.*,

862 F.3d 346, 351–52 (3d Cir. 2017) (quoting Intrusion upon Seclusion, Restatement (Second) of Torts § 652B, cmt. d (1977)). Thus, if we were asking whether Ward's single unwanted voicemail would be *actionable* on an intrusion-upon-seclusion theory, the answer would be "no" because Ward's harm is insufficiently severe. *See id.* (noting that "two or three" unwanted calls do not support the tort). But that is not what we are asking. Instead, we are asking whether Ward has standing, and thus whether the harm that he has identified is similar in kind—even if substantially less severe in degree—to the sort of harm that would be actionable at common law. *TransUnion*, 141 S. Ct. at 2208–11. Of course it is. The difference between one unwanted call and many is one of degree, not of kind. As the Third Circuit has explained in holding that a single unwanted voicemail is a concrete harm for purposes of a damages suit brought under the Telephone Consumer Protection Act ("TCPA"), "Congress was not inventing a new *theory* of injury when it [prohibited unwanted telephone calls under the TCPA]. Rather, it elevated a harm that, while 'previously inadequate in law,' was of the same character of previously existing 'legally cognizable injuries.'" *Susinno*, 862 F.3d at 352 (emphasis added) (quoting *Spokeo*, 136 S.Ct. at 1549); *see also Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017). The same is so here, where Congress enacted the FDCPA to protect against the invasions of privacy that occur from unwanted debt-collection calls. *See* 15 U.S.C. § 1692. We may think that Congress has elevated a relatively insignificant harm, but that was Congress's decision to make, and it is not a reason to hold that Ward lacks standing to sue.

NPAS, for its part, does not engage with Ward's analogy to intrusion upon seclusion. Instead, it argues that, as a factual matter, its conduct did not create the risk that Ward attributes to it. NPAS's argument has some appeal when taken in a vacuum—after all, how much difference could leaving the "Inc." off of "NPAS" really make? But "[w]hether a procedural violation is cognizable depends on the particular circumstances of the case," *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 868 (6th Cir. 2020), and here that missing "Inc." was significant. As Ward notes, there appears to be another entity—NPAS Solutions, LLC—with a nearly identical name engaged in substantially similar business as the NPAS that contacted Ward. Appellant's Supp. Br. at 2–4 & n.1. This created a real risk—a risk that materialized—that Ward would assert his rights against the wrong entity. NPAS argues that it properly identified itself as "NPAS, Inc." in letters to Ward, and thus that Ward should have known that the voicemails were

also from "NPAS, Inc.," but it is unclear from the record when Ward received or read those letters, and at the summary-judgment stage we draw all inferences in Ward's favor. *See Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In any event, Ward might reasonably have concluded that the voicemails were more irritating and focused his ire accordingly without regard for the letters. Or Ward might reasonably have concluded that the two NPASs were the same entity, not appreciating the difference between the corporation and the LLC. Whichever way, at this stage, the record is sufficient to establish that Ward suffered a concrete harm and thus has standing to sue.

The majority rejects Ward's argument that NPAS's unwanted voicemail establishes his standing to sue because Ward failed to "'clearly allege' that harm in his complaint." Maj. Op. at 8 (quoting *Spokeo*, 136 S. Ct. at 1547). But Ward clearly alleged that he sent a cease-and-desist letter to NPAS Solutions, LLC in December 2018, R. 15 (Am. Compl. at ¶¶ 16–17) (Page ID #36), and it is undisputed that Ward received another voicemail from NPAS thereafter, R. 51-3 (S.U.M.F. at 12) (Page ID #353) (undisputed that Ward received the offending voicemail on March 14, 2019). Thus, even if Ward's pleadings are deficient (apparently because they do not identify the dates of the voicemails relative to the date of his letter) we should look to the whole record to assess standing, as we did in another case where standing was raised for the first time on appeal, after the plaintiff lost their opportunity to amend the pleadings. *League of United Latin Am. Citizens (LULAC) v. Bredesen*, 500 F.3d 523, 529–30 (6th Cir. 2007). NPAS failed to raise standing in its answer to Ward's complaint and failed to raise standing at the summary-judgment stage. *See generally* R. 25 (Answer) (Page ID #60–66); R. 47 (Mot. S.J.) (Page ID #147–49); R. 48 (Brief on Mot. S.J.) (Page ID #208–28). Although we must consider whether a litigant has standing even when the issue is raised for the first time on appeal, "it would not serve justice to dismiss the appeal at this point because of a technical pleading deficiency, in the face of undisputed record facts confirming that [Ward] actually do[es] have standing and did have standing to prosecute [his] claims when the complaint was filed." *LULAC*, 500 F. 3d at 529. In light of our holding in *LULAC*, we must look past any potential deficiency in Ward's

pleadings—the record adequately fills in the gaps and demonstrates that he has standing to sue. *See id.*[1]

In sum, Ward's asserted harm—a single unwanted voicemail—may seem trivial or insignificant, but it is concrete and that is all that we are to decide under the Court's standing precedent. That being the case, and there being no question that Ward has otherwise satisfied the elements of standing, the majority errs in dismissing his appeal for lack of jurisdiction. We can and should reach the merits of his claim, whatever they may be, and so I respectfully dissent.

---

[1]Ward's cease-and-desist letter does not appear in the record and ordinarily we require a plaintiff to establish standing as they would any other element of their claim at the summary-judgment stage. *Lujan*, 504 U.S. at 561. But Ward's failure to include the letter in the record is attributable to NPAS's own failure to raise the issue earlier and does not doom Ward's appeal. Although Ward would ultimately bear the burden of establishing standing before he could recover, *id.*, he was under no such obligation to offer evidence of standing in response to a motion for summary judgment by NPAS that did not raise the issue. Thus, under the circumstances, it is appropriate to accept Ward's allegations regarding the date of his letter to NPAS Solutions, LLC. To the extent that the letter's existence in the record (as opposed to allegations of its existence) were required, the proper course would be to remand to the district court in order to allow Ward to introduce the letter in light of NPAS's newly raised arguments. *See Duncan v. Liberty Mut. Ins.*, 745 F. App'x 575, 578 (6th Cir. 2018).